# EXHIBIT A

ACLU | NATIONAL WOMEN'S LAW CENTER | ACLU Illinois | nclej National Center for Law and Economic Justice | ACLU Colorado

March 11, 2026

U.S. Department of Health and Human Services
Hubert H. Humphrey Bldg., Suite 729H
200 Independence Avenue, SW
Washington, DC 20201
FOIARequest@hhs.gov
(202) 690-7453

**Re: Request Under Freedom of Information Act Concerning Recent Restrictions on Child Care and Family Assistance Funds**

**(Expedited Processing & Fee Waiver/Limitation Requested)**

To Whom It May Concern:

The American Civil Liberties Union and the American Civil Liberties Union Foundation ("ACLU"),[1] the National Women's Law Center ("NWLC"),[2] the National Center for Law and Economic Justice ("NCLEJ),"[3] the Roger Baldwin Foundation of ACLU ("ACLU-IL"),[4] and the ACLU Foundation of Colorado[5] ("ACLU-CO") (together, "Requesting Parties") submit this Freedom of Information Act ("FOIA") request ("Request") for records pertaining to the Trump administration's racially and politically motivated restrictions on essential child care and family assistance funds—including the Child Care Development Fund ("CCDF"), Temporary

[1] The American Civil Liberties Union is a non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators. The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about civil rights and civil liberties issues across the country.

[2] The National Women's Law Center is a non-profit, 26 U.S.C. § 501(c)(3) organization that has worked for over fifty years to advance and protect women's legal rights and to remove barriers faced by women and LGBTQIA+ individuals in core aspects of their lives, including the lack of access to affordable, quality child care.

[3] For over sixty years, the National Center for Law and Economic Justice, a non-profit organization pursuant to 26 U.S.C. § 501(c)(3), has worked to ensure that every person has the means to live and thrive through litigation, policy advocacy and support of grassroots organizing in relation to protections for public benefits and low wage workers.

[4] The Roger Baldwin Foundation of ACLU (ACLU of Illinois) is a non-profit, 26 U.S.C. § 501(c)(3) public interest organization that is dedicated to protecting and expanding the civil rights and civil liberties enshrined in the Illinois and U.S. Constitutions.

[5] The ACLU Foundation of Colorado is a non-profit, 26 U.S.C. § 501(c)(3) organization with a mission to maintain and advance civil rights and civil liberties and to ensure that the U.S. government acts in compliance with the Constitution and laws of the United States, with a focus on impacts in the state of Colorado.

Assistance for Needy Families ("TANF"), and Social Services Block Grant ("SSBG")—through the adoption, implementation, and enforcement of the nationwide Enhanced Defend the Spend Policy and Five-State Funding Freeze.

## I. Background

Over the past several months, the Trump administration has imposed sweeping and unprecedented restrictions on federal funding for essential child care and family assistance programs across the country. These restrictions are part of the administration's broader effort to dismantle the already-burdened child care system and other supports that enable families with low incomes—and particularly women—to work, go to school, and otherwise secure basic needs for themselves and their children.[6] Moreover, the Trump administration has sought to justify these restrictions through racially and politically motivated attacks on Somali communities and Democratic state leaders, particularly in Minnesota and other Democratic-led states.

### a. The Trump Administration's Escalating Attacks on Child Care and Family Assistance Programs

Starting in late November 2025, the Trump administration began to launch public attacks against the Somali community and Democratic state leaders in Minnesota, claiming that "Minnesota has become 'a hub of fraudulent money laundering activity,' where 'refugees from Somalia are completely taking over the once great State.'"[7] The administration weaponized prior allegations of fraud in a USDA-funded nutrition program—which were investigated and prosecuted during the Biden administration in collaboration with Minnesota state officials—to justify launching myriad anti-Somali and anti-immigrant actions, including the termination of Temporary Protected Status for Somali people.[8] In early December, President Trump made numerous derogatory statements about people of Somali descent, including that they "contribute nothing" and are "garbage," and that he "do[esn't] want them in our country."[9]

---

[6] *See, e.g.*, Jessica Grose, *The Heritage Foundation Wants to Send American Women Back Half a Century*, N.Y. Times (Jan. 21, 2026), https://www.nytimes.com/2026/01/21/opinion/heritage-foundation-women.html; *see also* Nat'l Women's Law Ctr., *The Group Behind Project 2025 Plans to Restore the "American Family" By Coercing Women into Marriage* (Feb. 2026), https://nwlc.org/wp-content/uploads/2026/02/NWLC-Fact-Sheet-on-Heritage-Foundation-Marriage-Rates-Report.pdf.

[7] The White House, *Yes, "There's Something Wrong with Walz" – and it Cost Taxpayers $1 Billion* (Dec. 1, 2025), https://www.whitehouse.gov/articles/2025/12/yes-theres-something-wrong-with-walz-and-it-cost-taxpayers-1-billion/.

[8] *See id.*

[9] Associated Press, *WATCH: Trump says he doesn't want Somali migrants in the U.S., calls people 'garbage'*, PBS News (Dec. 2, 2025), https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage.

On December 26, 2025, YouTube creator Nick Shirley posted a 43-minute viral video making unsubstantiated fraud allegations about Somali child care providers in Minnesota.[10] Shirley described the video as an investigation of "Minnesotas [sic] billion dollar fraud scandal involving Tim Walz and the Somali population… if this video gets 100K likes I will do a part 2!"[11] In the video, Shirley and his associate David Hoch[12] attempt to enter child care centers and confront bystanders who are identified by Shirley as "Examples of Somali Childcare Fraud in Minesota [sic]" and "Somali Fraudsters."[13] Notably, Shirley has a long history of targeting Somali and other immigrant communities in his videos, and he previously participated in the administration's roundtable about anti-ICE protests.[14]

Even though state officials found no evidence to support these allegations,[15] Vice President J.D. Vance[16] and the social media account for the U.S. Department of Health and Human Services ("HHS") quickly shared Shirley's video.[17] Minnesota House Speaker Lisa Demuth, who had recently launched her campaign as a Republican candidate for governor, further revealed at a press conference that her caucus had been sharing information and "working with Nick Shirley" to publicize these fraud allegations.[18]

---

[10] Nick Shirley (@NickShirley), *I Investigated Minnesota's Billion Dollar Fraud Scandal*, YouTube (Dec. 26, 2025), https://www.youtube.com/watch?v=r8AulCA1aOQ&t=678s; *see also* Ken Bensinger & Ernesto Londoño, *An Intense White House Response From a Single Viral Video*, N.Y. Times (Dec. 31, 2025), https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html; Rachel Treisman, *What to know about Nick Shirley, the YouTube alleging day care fraud in Minnesota*, NPR (Jan. 1, 2026), https://www.npr.org/2025/12/31/nx-s1-5662600/nick-shirley-minnesota-daycare-fraud.

[11] Shirley, *supra*, note 10.

[12] David Hoch was "the main source in Shirley's video [and] received information on the centers from Republican staffers in Minnesota." Chabeli Carrazana, *Here's what's really happening with child care fraud in Minnesota*, The 19th (Jan. 9, 2026), https://19thnews.org/2026/01/child-care-fraud-minnesota-fact-check/. Hoch also served as a witness in a Senate Judiciary Committee hearing on February 4, 2026, entitled "Somali Scammers: Fighting Fraud in Minnesota and Beyond," where he was introduced as an independent investigative journalist. *Somali Scammers: Fighting Fraud in Minnesota and Beyond Before the S. Comm. On the Judiciary,* 120th Cong. (2026).

[13] Shirley, *supra*, note 10.

[14] Jonah Valdez, *Right-Wing YouTuber Behind Viral Minnesota Fraud Video Has Long Anti-Immigrant History*, The Intercept (Dec. 31, 2025), https://theintercept.com/2025/12/31/nick-shirley-videos-minnesota-somali-day-cares-fraud-claims/.

[15] Howard Thompson, *Minnesota officials respond to day care fraud viral video: 'No findings of fraud'*, Fox9 (Dec. 29, 2025), https://www.fox9.com/news/minnesota-daycares-youtuber-payments-dec-2025.

[16] Dana Ferguson, *Minnesota Republicans defend their focus on fraud despite the ICE surge that followed*, NPR (Feb. 17, 2026), https://www.npr.org/2026/02/17/nx-s1-5716113/minnesota-nick-shirley-fraud-ice-minneapolis.

[17] Department of Health and Human Services (@HHSGov), X (Dec. 30, 2025 4:21 PM), https://x.com/HHSGov/status/2006113526285230198?s=20.

[18] Katie Wermus, *Minnesota GOP worked with YouTuber on child care fraud viral video*, Fox9 (Dec. 31, 2025), https://www.fox9.com/news/minnesota-gop-worked-youtuber-investigation-child-care-fraud; *see also* Clay Masters & Gretchen Brown, *Demuth: GOP caucus directed YouTuber to Minnesota. A professor explains why it went viral*,

On December 30—just four days after Shirley's video was released—HHS officials undertook a series of unprecedented actions undermining federal programs that provide essential child care and family assistance to families with low incomes and their children across the country. The programs targeted by these attacks—including CCDF, TANF, and SSBG—are the primary sources of federal child care funding to states, territories, and tribes. Congress designed these programs to provide states, territories, and tribes with "great flexibility" in the design and operation of these programs with support from HHS's Administration for Children and Families ("ACF").[19] Citing the unsubstantiated allegations in Shirley's video, the administration has advanced the following restrictions at issue in this Request:

**Enhanced Defend the Spend Policy.** On December 30, HHS and ACF announced via social media that they had "activated [their] defend the spend system for all ACF payments," asserting that "all ACF payments across America will require a justification and a receipt or photo evidence before we send money to a state" and that "[f]unds will be released only when states prove they are being spent legitimately."[20] The same day, the HHS Department of Government Efficiency ("HHS DOGE") team[21] announced via social media: "The HHS DOGE team has expanded the Defend the Spend system to require all ACF payments across America to be justified," and that it would "expand the system to support itemized receipts and photographic evidence, and make all data/receipts, where possible, available to the public."[22] In other words, the Enhanced Defend the Spend Policy restricts access to already-obligated funds unless and until the recipients submit written justification and documentation to "verify" each request to

---

MPR News (Dec. 30, 2025), https://www.mprnews.org/story/2025/12/29/youtuber-nick-shirley-accuses-somaliowned-day-care-centers-of-fraud.

[19] *See* Karen E. Lynch, *The Child Care and Development Block Grant: In Brief* (Dec. 3, 2024), https://www.congress.gov/crs-product/R47312; Stephanie Schmit and Rachel Wilensky, *Cuts to SSBG, TANF Would Eliminate Child Care for 40K Children, Disrupt Care for Millions More*, The Ctr. For Law and Social Policy (Mar. 2025), 2025.3.5_Cuts-to-SSBG-TANF-Would-Eliminate-Child-Care.pdf.

[20] HHS Deputy Secretary Jim O'Neill (@HHS_Jim), X (Dec. 30, 2025 5:51 PM), https://x.com/HHS_Jim/status/2006136004294664464?s=20; Dep't of Health & Human Servs., *HHS Freezes Child Care and Family Assistance Grants in Five States for Fraud Concerns*, Press Release (Jan. 6, 2026), https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. *See also* Shauneen Miranda, *After Minnesota Fraud Allegations, HHS Orders States to Justify Child Care Spending*, The 74 (Jan. 5, 2026), https://www.the74million.org/zero2eight/after-minnesota-fraud-allegations-hhs-orders-states-to-justify-child-care-spending/.

[21] On January 20, 2025, President Trump issued an executive order establishing the "Department of Government Efficiency" ("DOGE"), renaming the United States Digital Services as the United States DOGE Services (USDS)," "establish[ing]" USDS in the Executive Office of the President, and establishing a temporary organization called "the U.S. DOGE Service Temporary Organization," pursuant to 5 U.S.C. § 3161. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025). For purposes of this Request, these entities are collectively referred to as "USDS."

[22] DOGE HHS (@DOGE_HHS), X (Dec. 30, 2025 6:27 PM), https://x.com/DOGE_HHS/status/2006145075315929532.

draw down funds, and federal officials review and approve the submitted requests.[23] The administration has not publicly provided any guidance or clarification about the types of documentation required or the standards for "verifying" funding requests.[24]

**Five-State Funding Freeze.** On December 30, HHS and ACF also announced via social media that they had "frozen all child care payments" to the state of Minnesota and demanded an audit of the providers named in Shirley's video, which HHS Deputy Secretary Jim O'Neill referred to as "excellent work."[25] On December 31, the HHS DOGE team announced via social media that "[a]ll ACF payments to Minnesota will remain paused until individual receipts and written justifications are submitted."[26] Soon after, on January 6, 2026, HHS escalated its actions by freezing access to over $10 billion in CCDF, TANF, and SSBG funds for California, Colorado, Illinois, Minnesota, and New York ("Five-State Funding Freeze").[27] The Five-State Funding Freeze also included onerous demands to each state for sensitive information, data, and documents about service providers and program participants, including attendance records and personal information about certain program participants.[28]

---

[23] HHS Deputy Secretary Jim O'Neill (@HHS_Jim), X (Dec. 30, 2025 5:51 PM), https://x.com/HHS_Jim/status/2006136004294664464?s=20; Dep't of Health & Human Servs., *HHS Freezes Child Care and Family Assistance Grants in Five States for Fraud Concerns*, Press Release (Jan. 6, 2026), https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html.

[24] *See, e.g.*, Shauneen Miranda, *After Minnesota Fraud Allegations, HHS Orders States to Justify Child Care Spending*, The 74 (Jan. 5, 2026), https://www.the74million.org/zero2eight/after-minnesota-fraud-allegations-hhs-orders-states-to-justify-child-care-spending/; Press Release, *Rep. Chu Leads Ways & Means Democrats in Introducing Resolution of Inquiry into Trump's New "Defend the Spend" Barriers to Childcare Funding* (Feb. 25, 2026), https://chu.house.gov/media-center/press-releases/rep-chu-leads-ways-means-democrats-introducing-resolution-inquiry.

[25] HHS Deputy Secretary Jim O'Neill (@HHS_Jim), X (Dec. 30, 2025 5:51 PM), https://x.com/HHS_Jim/status/2006136004294664464?s=20.

[26] DOGE HHS (@DOGE_HHS), X (Dec. 31, 2025 1:30 PM), https://x.com/DOGE_HHS/status/2006432680192459039.

[27] Dep't of Health & Human Servs., *HHS Freezes Child Care and Family Assistance Grants in Five States for Fraud Concerns*, Press Release (Jan. 6, 2026), https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. On January 9, 2026, a New York federal district court issued a temporary restraining order enjoining the implementation of the Five-State Funding Freeze, *see* Order, Doc. 23, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB (S.D.N.Y. Jan. 9, 2026), which was extended through February 6, 2026, *see* Order, Doc. 64, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB (S.D.N.Y. Jan. 23, 2026). On February 6, the New York federal district court granted a preliminary injunction against the Five-State Funding Freeze. *See* Order, Doc. 71, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB (S.D.N.Y. Feb. 6, 2026).

[28] Ex. 1 to Pls. Compl. ("CCDF Letters"), Doc. 1-1, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB (S.D.N.Y. filed Jan. 8, 2026), https://www.courtlistener.com/docket/72123419/1/1/state-of-new-york-v-administration-for-children-and-families/; Ex. 2 to Pls. Compl. ("TANF Letters"), Doc. 1-2, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB (S.D.N.Y. filed Jan. 8, 2026), https://storage.courtlistener.com/recap/gov.uscourts.nysd.655886/gov.uscourts.nysd.655886.1.2.pdf; Ex. 3 to Pls. Compl. ("SSBG Letters"), Doc. 1-3, *New York v. Admin. for Children & Families*, No. 1:26-cv-00172-VSB

**b. These Restrictions Have Resulted in Actual or Threatened Delays in Funding, Inflicting Significant Harms on Families and Child Care Providers.**

Since the Trump administration adopted these restrictions, media reports have revealed widespread fear and concern about actual or potential disruptions in funding and access to these essential child care and family assistance programs nationwide. For example, the Missouri Department of Elementary and Secondary Education released a public statement that it was unable to draw down CCDF funds due to the new documentation requirements under the Enhanced Defend the Spend Policy, resulting in payment delays to 1,743 (or roughly 53 percent) Missouri child care providers.[29] These delays reportedly forced at least one provider to temporarily close, disrupting services for dozens of children and their families, and caused other providers to take out loans to make payroll or to put off paying rent and bills.[30] The Coalition of Large Tribes also reported that many of its tribes had not received any ACF payments, forcing tribes to front costs with their limited funds on hand so that child care providers could make payroll.[31]

The continued uncertainty surrounding the Trump administration's restrictions has caused child care providers and directly impacted families who rely on these programs significant distress, uncertainty, and other harms.[32] CCDF, TANF, and SSBG funds provide essential child care and family assistance so that parents and caregivers with low incomes can go to work, go to school, attend medical appointments, and otherwise secure basic needs for

(S.D.N.Y. filed Jan. 8, 2026), https://storage.courtlistener.com/recap/gov.uscourts.nysd.655886/gov.uscourts.nysd.655886.1.3.pdf.

[29] Missouri Dep't of Elementary & Secondary Educ., *Missouri Submits Justification for Federal Child Care Payments* (Jan. 9, 2026), https://dese.mo.gov/communications/missouri-submits-justification-federal-child-care-payments.

[30] Tod Palmer, *Missouri DESE receives delayed federal child care subsidy payments*, KSHB41 (Jan. 13, 2026), https://www.kshb.com/news/local-news/missouri-dese-receives-delayed-federal-child-care-subsidy-payments; Stephen Quinn, *Delayed federal funds start flowing to Missouri child care providers*, Missouri Independent (Jan. 14, 2026), https://www.columbiamissourian.com/news/state_news/delayed-federal-funds-start-flowing-to-missouri-child-care-providers/article_641e3b81-c26b-46c7-9dca-2183d9471770.html; Katie Grawitch and Jodi Fortino, *Missouri child care funding has been restored after trump administration froze payments*, KCUR (Jan. 14, 2026),https://www.kcur.org/education/2026-01-14/missouri-child-care-funding-restored-trump-administration; Chad Mira, *Missouri childcare center closes temporarily amid subsidy delays*, FOX2now (Jan. 12, 2026) https://fox2now.com/news/missouri/missouri-childcare-center-closes-temporarily-amid-subsidy-delays/.

[31] *Tribal Coalition Seeks Balanced Oversight as Childcare Funding Delays Hit Rural Communities*, Illinois Review (Jan. 9, 2026), https://www.illinoisreview.com/illinoisreview/2026/01/tribal-coalition-seeks-balanced-oversight-as-childcare-funding-delays-hit-rural-communities.html#google_vignette.

[32] Carter Sherman, *'Catastrophic': fears for families after Trump officials cut $10bn in social funds*, The Guardian (Jan. 8, 2026), https://www.theguardian.com/us-news/2026/jan/08/trump-billions-social-funds-programs.

themselves and their families.[33] Disruptions in these vital services inflict significant immediate and long-term harms on these families and their children, including missing or losing employment and education opportunities, financial hardship and instability, food insecurity, and negative impacts on physical and mental health and well-being.[34] Indeed, even the threat of funding delays results in "significant disruption, fear and instability within an already fragmented child care system," often leading providers to contemplate staffing cuts and families to search for other care options.[35] The administration's decision to impose funding restrictions in reliance on unsubstantiated allegations by a social media influencer with a history of spreading racist and anti-immigrant misinformation[36] not only harms families, but also creates a dangerous environment for providers and children by encouraging extremists to show up at child care programs, demanding to be let in.[37]

Moreover, these consequences fall hardest on low-income and working women—and, in particular, Black women and other women of color—who disproportionately assume caregiving responsibilities and are more likely to be forced to miss work or lose job opportunities due to lack of stable and affordable child care options.[38] Women disproportionately "bear the cost of

---

[33] Press Release, Nat'l Women's Law Ctr, *More Than 200 State Policymakers from all 50 States Urge Congressional Action to Restore Child Care Funding*, (Feb. 4, 2026), https://nwlc.org/press-release/more-than-200-state-policymakers-from-all-50-states-urge-congressional-action-to-restore-child-care-funding/.

[34] *See, e.g.*, Daphna Bassok et al., *What happens when families cannot access child care subsidies?*, Brookings Institution (Jan. 20, 2026), https://www.brookings.edu/articles/what-happens-when-families-cannot-access-child-care-subsidies/; Amy K. Matsui, *Trump's overreaction to charges of fraud is harming thousands—and that's the goal*, The Hill (Jan. 23, 2026), https://thehill.com/opinion/white-house/5701081-child-care-funding-freeze/.

[35] Start Early, *Federal Actions Threaten Access to Child Care Nationwide* (Jan. 9, 2025), https://www.startearly.org/post/federal-actions-threaten-access-to-child-care-nationwide/.

[36] Rachel Treisman, *What to know about Nick Shirley, the YouTuber alleging day care fraud in Minnesota*, NPR (Jan. 1, 2026) https://www.npr.org/2025/12/31/nx-s1-5662600/nick-shirley-minnesota-daycare-fraud.

[37] *See, e.g.*, Moriah Balingit & Charlotte Kramon, AP, *Right-wing influencers target Somali child care centers after viral Minneapolis video*, KTLA5 (Feb. 1, 2026), https://ktla.com/news/ap-us-news/ap-right-wing-influencers-are-targeting-somali-child-care-centers-leaving-some-fearing-for-safety/; David Ingram & Tyler Kingkade, *Influencers descend on day cares across the U.S. after Minnesota fraud claims*, NBC News (Jan. 4, 2026), https://www.nbcnews.com/tech/internet/influencers-target-day-cares-fraud-claims-somalis-rcna251661.

[38] Written Testimony of Amy K. Matsui, Nat'l Women's Law Ctr., *Who's Watching the Kids? How Employers, Innovators, and Parents Are Solving America's Child Care Crunch*, Jan. 13, 2026, at 3–4, https://edworkforce.house.gov/uploadedfiles/amy_matsui_written_testimony.pdf. *See also* Nat'l Women's Law Ctr., *Child Care Problems Disproportionately Impacted Black Women, Latinas, Disabled Women, and Those with Lower Household Incomes in 2024* (Dec. 15, 2025), https://nwlc.org/resource/child-care-problems-disproportionately-impacted-black-women-latinas-disabled-women-and-those-with-lower-household-incomes-in-2024/; Katica Roy, *How the federal funding freeze could devastate millions of mothers and children*, MS NOW (Jan. 30, 2025), https://www.ms.now/know-your-value/out-of-office/federal-funding-freeze-devastate-millions-mothers-children-rcna190038; Amy Barasch, *Social Services Cuts Will Mean More Women Stop Working – and Maybe That's the Point*, Ms. Magazine (Jan. 9, 2026), https://msmagazine.com/2026/01/09/trump-social-services-childcare-fraud-cuts-new-york-california-minnesota-colorado-illinois-women-work/.

maintaining our nation's care infrastructure" in both their personal and professional capacities.[39] When there are limited care options (either from an already insufficient care system[40] or intermittent closures due to the aforementioned "heartless" funding restrictions[41]), mothers are more likely to take time off work to care for their children than fathers.[42] At the same time, Black women and other women of color are overrepresented in the underpaid and undervalued care workforce.[43] As a result, the toll of the administration's funding restrictions has and will continue to result in gender and race disparities.

The administration's actions are harming women, families, and child care providers—and the underfunded and fragile child care system as a whole. Indeed, the administration appears to be taking its cues to roll back access to child care from organizations committed to policies that restrict women's economic independence like the Heritage Foundation,[44] which has advocated to "restor[e] the family" by, in part, promoting "at-home childcare and child raising"—to be disproportionately performed by women, who would no longer be able to leave their homes to work—"instead of paid outside childcare."[45] Rather than developing real solutions, like ensuring that all families can access affordable, high-quality child care and that child care workers, among whom women of color are overrepresented, are well-compensated for the important work that they do caring for our youngest children, the administration has taken extreme and harmful actions that undermine child care in this country.[46]

---

[39] Written Testimony of Amy K. Matsui, Nat'l Women's Law Ctr., *Who's Watching the Kids? How Employers, Innovators, and Parents Are Solving America's Child Care Crunch*, Jan. 13, 2026, at 3–4, https://edworkforce.house.gov/uploadedfiles/amy_matsui_written_testimony.pdf. *See also* Amy K. Matsui, *Trump's overreaction to charges of fraud is harming thousands—and that's the goal*, The Hill (Jan. 23, 2026), https://thehill.com/opinion/white-house/5701081-child-care-funding-freeze/.

[40] Sarah Javaid and Melissa Boteach, *Child Care is Unaffordable in Every State*, Nat'l Women's Law Ctr. (Feb. 2025), https://nwlc.org/wp-content/uploads/2025/01/Child-Care-Is-Unaffordable-in-Every-State-January-2025.pdf.

[41] Moriah Balingit, *Head Start and Medicaid providers hit glitches as Trump freezes federal money,* AP News (Jan. 28, 2025), https://apnews.com/article/head-start-medicaid-federal-funding-4fe440e35df70c7ede8ce8e0409cb581.

[42] Erin George, *Mothers' employment has surpassed pre-pandemic levels, but the child care crisis persists,* Blog, U.S. Dep't of Labor (May 6, 2024), https://blog.dol.gov/2024/05/06/mothers-employment-has-surpassed-pre-pandemic-levels-but-the-child-care-crisis-persists.

[43] Written Testimony of Amy K. Matsui, Nat'l Women's Law Ctr., *Who's Watching the Kids? How Employers, Innovators, and Parents Are Solving America's Child Care Crunch*, Jan. 13, 2026, at 3–4, https://edworkforce.house.gov/uploadedfiles/amy_matsui_written_testimony.pdf.

[44] NWLC, *The Group Behind Project 2025 Plans to Restore the "American Family" By Coercing Women into Marriage* (Feb. 2026), https://nwlc.org/wp-content/uploads/2026/02/NWLC-Fact-Sheet-on-Heritage-Foundation-Marriage-Rates-Report-1.pdf.

[45] Roger Severino et al., *Saving America by Saving the Family: A Foundation for the Next 250 Years*, Heritage Foundation (Jan. 8, 2026), https://www.heritage.org/marriage-and-family/report/saving-america-saving-the-family-foundation-the-next-250-years; *see id*.

[46] *See* Ruth Friedman*, Trump and Republicans in Congress Are Making the Child Care Crisis Even Worse*, The Century Foundation (Oct. 7, 2025), https://tcf.org/content/commentary/trump-and-republicans-in-congress-are-

To provide the American public with information about the administration's unprecedented restrictions on child care and family assistance funds through the Enhanced Defend the Spend Policy and the Five-State Funding Freeze, we seek such information through this FOIA request.

**c. These Restrictions Appear to Be Politically Targeted and Motivated by Animus against Somali and Other Immigrant Communities.**

In justifying the Enhanced Defend the Spend Policy and the Five-State Funding Freeze in Minnesota and beyond, the Trump administration has repeatedly invoked racist stereotypes about people of Somali descent and other immigrant communities, and repeated politically targeted accusations against Democratic state leaders.[47] In an interview, HHS official Dr. Mehmet Oz claimed that "you have the Somalians who don't have the same cultural resistance to fraud," while HHS Deputy Secretary O'Neill explained "that's a very different culture not based on trust and based on . . . just sort of building a whole lifestyle around fraud."[48] In addition, during a nearly hour-long interview with Shirley, Deputy Secretary O'Neill repeatedly attributed alleged fraud in Minnesota to "political machines in big cities, often involving like an unassimilated immigrant group . . . end[ing] up with a whole complicated but stable system of [] public money being steered into fraud and voting blocks [] cooperating with the fraud and voting for certain politicians," and agreed that Minnesota Democratic leaders "use[d]" people of Somali descent to "create all the fraud."[49] President Trump's own statements underscore the animus against Somali communities driving these attacks: On December 31—the day after HHS announced the Enhanced Defend the Spend Policy, President Trump stated via social media: "Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. . . . Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth."[50]

---

making-the-child-care-crisis-even-worse/; Shira Small, Rachel Wilensky, and Stephanie Schmit, *How the First Year of Trump Administration Undermined Child Care and Early Education Programs in 2025*, The Center for Law and Social Policy (Jan. 2026), https://www.clasp.org/wp-content/uploads/2025/12/How-the-Trump-Administration-has-Undermined-Child-Care-and-Early-Education-Programs-UPDATED-JANUARY-26.pdf.

[47] In announcing these restrictions, HHS Deputy Secretary O'Neill and ACF Assistant Secretary Alex Adams specifically referenced Shirley's video, including "the serious allegations that the state of Minnesota has funneled millions of taxpayer dollars to fraudulent daycares across Minnesota over the past decade." HHS Deputy Secretary Jim O'Neill (@HHS_Jim), X (Dec. 30, 2025, at 5:51 PM ET), https://x.com/HHS_Jim/status/2006136004294664464?s=20.

[48] Alpha News, Liz Collin Reports, *EXCLUSIVE: 'The mob mentality is stunning'—Dr. Oz and HHS Sec. O'Neill discuss fraud in Minnesota*, at 6:32 (YouTube, Jan. 14, 2026), https://www.youtube.com/watch?v=koXq8CvD9dQ.

[49] Nick Shirley, *Exposing How the US Government Commits Fraud Against its Citizens*, at 8:06 (YouTube, Feb. 6, 2026), https://www.youtube.com/watch?v=ldF40H8TN5Q&t=576s.

[50] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 31, 2025, 10:55 AM ET), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464. During a speech days later, President Trump referenced Shirley's fraud allegations against Somali-owned child care programs, stating: "We've frozen all

## II. Requested Records

The Requesting Parties seek the release of the following records[51] from HHS and any of its components,[52] for the period from December 1, 2025 to present:

1. All records regarding the adoption, implementation, and enforcement of the Enhanced Defend the Spend Policy for ACF payments, including, but not limited to, records sufficient to identify or describe:
   a. The justifications, if any, for the Enhanced Defend the Spend Policy;
   b. The legal authority, if any, for the Enhanced Defend the Spend Policy;
   c. The ACF grant programs subject to the Enhanced Defend the Spend Policy;
   d. The type(s) of information, data, and/or documentation that the Enhanced Defend the Spend Policy requires a funding recipient to submit prior to approving and/or authorizing its request to draw down ACF funds;
   e. The policies and procedures regarding the access, review, approval, and/or authorization of funding recipients' requests to draw down ACF funds, including,

---

children's payments to those states. . . [I]f you're on public assistance, like almost all Somalis are . . . You can't wire money out of the country back to your bank account from where you came. But more importantly, we probably aren't even going to give them the money anymore." Rapid Response 47 (@RapidResponse47), X (Jan. 13, 2026 2:56 PM ET), https://x.com/RapidResponse47/status/2011165519131390348?s=20; *see also* The White House, *Back in Michigan, President Trump Celebrates Auto Industry, Economic Revival* (Jan. 13, 2026), https://www.whitehouse.gov/articles/2026/01/back-in-michigan-president-trump-celebrates-auto-industry-economic-revival/. And during his State of the Union address, President Trump referred to Minnesota's Somali community members as "pirates" who "ransacked" the state and "pillaged" taxpayer dollars while announcing the administration's so-called "war on fraud." Associated Press, *Read the complete transcript of Trump's 2026 State of the Union*, AP News (Feb. 25, 2026), https://apnews.com/article/donald-trump-transcript-state-of-union-2026-c13e2a07df999b464b733f4a6e84dbd4.

[51] FOIA defines "records" to include "any information" in "any format, including an electronic format." 5 U.S.C. § 552(f)(2). The term "records" includes all records, writings, and communications preserved in electronic or hard copy form, including, but not limited to, correspondence, letters, draft documents, data files, metadata, spreadsheets, video and/or audio recordings, CDs, DVDs, notes, meeting records, calendar entries, e-mails (and attachments thereto), text and/or audio messages on encrypted and non-encrypted applications (including, but not limited to, iMessage, Signal, WhatsApp, Microsoft Teams, Zoom, Slack, Facebook, X, or Truth Social), reports, instructions, guidance, guidelines, talking points, briefing materials, memoranda, agreements, contracts, memoranda of understanding and/or communications, analyses, orders, directives, notices, statements of policy, procedures, protocols, rules, or training manuals.

[52] The term "HHS" means the U.S. Department of Health and Human Services, and any components, subcomponents, offices, or personnel therein, including, but not limited to, the Immediate Office of the Assistant Secretary, the Office of the Secretary, the Office of the Deputy Secretary, the Administration for Children and Families (including, but not limited to, the Office of Child Care, the Office of Community Services, and the Office of Family Assistance), the Office of General Counsel, the Office of Public Affairs, and any task force, working group, or digital services unit involved in adoption, implementation, and/or enforcement of the Enhanced Defend the Spend Policy and/or Five-State Funding Freeze.

but not limited to, (i) who may access, review, approve, and/or authorize such requests and any supporting information, data, and/or documentation, and (ii) the reason(s) for which a request may or may not be approved and/or authorized under the Enhanced Depend the Spend Policy;

f. The roles and responsibilities of the HHS DOGE Team and/or USDS,[53] or any persons affiliated with or representing the HHS DOGE Team and/or USDS, in the adoption, implementation, and enforcement of the Enhanced Defend the Spend Policy, including, but not limited to, any proposed or actual use of any automated decision-making systems, algorithmic screening tools, fraud detection systems, artificial intelligence models and/or services, machine learning systems, risk scoring tools, data analytics platforms, software programs, applications, or other technology used to access, download, copy, analyze, evaluate, and/or publish information, data, documents, or other materials submitted with requests to draw down funds.

2. All written communications[54] with CCDF, TANF, and/or SSBG state, territory, and tribal grant recipients related to:
   a. Requests for information, data, or documentation related to such grant recipients' requests to draw down funds, and
   b. Actual or possible decisions not to approve and/or authorize a request to draw down funds (regardless of whether such decisions were conditional, temporary, and/or final in nature).

3. All records[55] regarding alleged fraud in HHS-funded child care and family assistance programs in Minnesota, California, Colorado, Illinois, and New York, including, but not limited to:
   b. All written communications with Nick Shirley and/or persons acting on behalf of Nick Shirley;

---

[53] The term "USDS" refers to the entities described in note 21, *supra*, including the Department of Government Efficiency ("DOGE"), the United States DOGE Service, and the United States DOGE Service Temporary Organization.

[54] For purposes of Request No. 2, the term "written communications" includes, but is not limited to, letters, notices, guidance, memoranda, instructions, e-mails (and attachments thereto), and text and/or audio messages (including, but not limited to, those sent through the Payment Management System or other platforms, such as iMessage, Signal, WhatsApp, Microsoft Teams, Zoom, Slack, Facebook, X, or Truth Social).

[55] For purposes of Request No. 3, the term "written communications" includes, but is not limited to, correspondence, video and/or audio recordings, calendar entries, e-mails (and attachments thereto), and text and/or audio messages on encrypted and non-encrypted applications (including, but not limited to, iMessage, Signal, WhatsApp, Microsoft Teams, Zoom, Slack, Facebook, X, or Truth Social).

c. All written communications with Lisa Demuth and/or persons acting on behalf of Lisa Demuth;
d. All written communications, memoranda, directives, and guidance containing both "fraud" and "Somali" (including variations of the root word "Somali" such as "Somalian" and "Somalia");
e. All written communications, memoranda, directives, instructions, and guidance regarding the report entitled "I Exposed Minnesotas [sic] Billion Dollar Fraud Scandal," published by Nick Shirley on YouTube on or around December 26, 2025; and
f. All written communications and audio and/or video recordings related to the interview between HHS Deputy Secretary Jim O'Neill and Nick Shirley, published by Nick Shirley on YouTube on or around February 4, 2026.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), we request that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, we request that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

## III. <u>Application for Expedited Processing</u>

We request expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

### a. The Requesting Parties Are Organizations Primarily Engaged in Disseminating Information to Inform the Public about Actual or Alleged Government Activity.

i. <u>The ACLU is primarily engaged in disseminating information to inform the public about actual or alleged government activity.</u>

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II). Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").[56]

[56] Many courts have found that the ACLU, as well as other organizations with similar missions that engage in information-dissemination activities similar to the ACLU are "primarily engaged in disseminating information."

The ACLU disseminates information about government activity through several different publications and platforms. For example, the ACLU regularly publishes the *ACLU* Magazine that reports on and analyzes current events related to civil rights and civil liberties.[57] The *ACLU* Magazine is disseminated to over one million donors. The ACLU also publishes regular updates and alerts via email to 4.8 million subscribers (comprised of both ACLU members and non-members). These updates are additionally broadcast to over 6.6 million social media followers. The *ACLU* Magazine, as well as the email and social-media alerts, often include descriptions and analysis of information about government activity obtained through FOIA requests. The ACLU also regularly issues press releases and statements to call attention to documents and materials obtained through FOIA requests, as well as other breaking news,[58] and ACLU attorneys and other staff members are interviewed frequently for news stories about documents released through ACLU FOIA requests.[59]

---

*See, e.g.*, *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. Dep't of Defense,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003).

[57] *See, e.g.*, *Free Speech, Free Country*, ACLU Magazine (Fall 2025), https://www.aclu.org/publications/aclu-magazine-fall-2025.

[58] *See, e.g.*, Press Release, ACLU, ACLU FOIA Litigation Reveals ICE Actively Considering Opening Seven New Immigration Detention Centers (Jan. 29, 2026), https://www.aclu.org/press-releases/aclu-foia-litigation-reveals-ice-actively-considering-opening-six-new-immigration-detention-centers; Press Release, ACLU, ACLU FOIA Litigation Reveals New Information About Plans to Expand ICE Detention in Colorado (July 9, 2025), https://www.aclu.org/press-releases/aclu-foia-litigation-reveals-new-information-about-plans-to-expand-ice-detention-in-colorado; Press Release, ACLU, Government Releases New Court Opinions Highlighting Further Abuse of Warrantless FISA Surveillance Program (July 21, 2023), https://www.aclu.org/press-releases/government-releases-new-court-opinions-highlighting-further-abuse-of-warrantless-fisa-surveillance-program; Press Release, ACLU, Federal Court Permanently Blocks Billions of Dollars in Border Wall Construction (June 28, 2019), https://www.aclu.org/press-releases/federal-court-permanently-blocks-billions-dollars-border-wall-construction; Press Release, ACLU, New Documents Reveal NSA Improperly Collected Americans' Call Records Yet Again (June 26, 2019), https://www.aclu.org/press-releases/new-documents-reveal-nsa-improperly-collected-americans-call-records-yet-again; Press Release, ACLU, ACLU and Center for Media Justice Sue FBI for Records on Surveillance of Black Activists (Mar. 21, 2019), https://www.aclu.org/press-releases/aclu-and-center-media-justice-sue-fbi-records-surveillance-black-activists; Press Release, ACLU, ACLU, Privacy International Demand Government Disclose Nature and Extent of Hacking Activities (Dec. 21, 2018), https://www.aclu.org/press-releases/aclu-privacy-international-demand-government-disclose-nature-and-extent-hacking; Press Release, ACLU, New Documents Reveal Government Plans to Spy on Keystone XL Protesters (Sept. 4, 2018), https://www.aclu.org/press-releases/new-documents-reveal-government-plans-spy-keystone-xl-protesters; Press Release, ACLU, ACLU Obtains Documents Showing Widespread Abuse of Child Immigrants in U.S. Custody (May 22, 2018), https://www.aclu.org/news/aclu-obtains-documents-showing-widespread-abuse-child-immigrants-us-custody; Press Release, ACLU, ACLU Demands CIA Records on Campaign Supporting Haspel Nomination (May 4, 2018), https://www.aclu.org/news/aclu-demands-cia-records-campaign-supporting-haspel-nomination; Press Release, ACLU, Advocates File FOIA Request For ICE Documents on Detention of Pregnant Women (May 3, 2018), https://www.aclu.org/news/advocates-file-foia-request-ice-documents-detention-pregnant-women.

[59] *See, e.g.*, Corin Faife, *Feds Are Tracking Phone Locations With Data Bought From Brokers*, The Verge (July 18, 2022), https://www.theverge.com/2022/7/18/23268592/feds-buying-location-data-brokers-aclu-foia-dhs; Charlie Savage, *N.S.A. Gathered Domestic Calling Records It Had No Authority to Collect*, N.Y. Times (June 26, 2019) , https://www.nytimes.com/2019/06/26/us/telecom-nsa-domestic-calling-records.html (quoting ACLU attorney Patrick Toomey); Rachel Frazin, *ACLU Sues FBI Over Black Activist Surveillance Records*, Hill (Mar. 21, 2019), https://thehill.com/policy/national-security/fbi/435143-fbi-sued-over-black-activist-surveillance-records (quoting ACLU attorney Nusrat Choudhury); Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavior Screening Program*, Intercept (Feb. 8, 2017), https://theintercept.com/2017/02/08/tsas-own-files-show-doubtful-

Similarly, the ACLU publishes reports about government conduct and civil rights and liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA requests. This material is broadly circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee. The ACLU's projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[60] The ACLU also regularly publishes books, "Know Your Rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil rights and civil liberties issues and government policies and practices that implicate those issues.[61]

The ACLU publishes a widely read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily.[62] The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. The ACLU also publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU's website also

science-behind-its-behavior-screening-program (quoting ACLU attorney Hugh Handeyside); Larry Neumeister, *Judge Scolds Government over Iraq Detainee Abuse Pictures*, The Associated Press (Jan. 18, 2017), https://apnews.com/general-news-865c32eebf4d457499c017eb837b34dc (quoting ACLU project director Hina Shamsi); Karen DeYoung, *Newly Declassified Document Sheds Light on How President Approves Drone Strikes*, Wash. Post (Aug. 6, 2016), http://wapo.st/2jy62cW (quoting former ACLU deputy legal director Jameel Jaffer); Catherine Thorbecke, *What Newly Released CIA Documents Reveal About 'Torture' in Its Former Detention Program*, ABC (June 15, 2016), https://abcnews.com/US/newly-released-cia-documents-reveal-torture-detention-program/story?id=39873389 (quoting ACLU attorney Dror Ladin).

[60] *See, e.g.*, ACLU, *Bad Trip: Debunking the TSA's 'Behavior Detection' Program* (Feb. 2017), https://www.aclu.org/sites/default/files/field_document/dem17-tsa_detection_report-v02.pdf; Carl Takei, *ACLU-Obtained Emails Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site* (Nov. 22, 2016), https://www.aclu.org/blog/speak-freely/aclu-obtained-emails-prove-federal-bureau-prisons-covered-its-visit-cias-torture; Brett Max Kaufman, *Details Abound in Drone 'Playbook' – Except for the Ones That Really Matter Most* (Aug. 8, 2016), https://www.aclu.org/news/national-security/details-abound-drone-playbook-except-ones-really-matter-most; ACLU, *Leaving Girls Behind: An Analysis of Washington D.C.'s "Empowering Males of Color" Initiative* (May 2016), https://www.aclu.org/report/leaving-girls-behind; Nathan Freed Wessler, *ACLU-Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida* (Feb. 22, 2015), https://www.aclu.org/blog/free-future/aclu-obtained-documents-reveal-breadth-secretive-stingray-use-florida; Nathan Freed Wessler, *FBI Documents Reveal New Information on Baltimore Surveillance Flights* (Oct. 30, 2015), https://www.aclu.org/news/privacy-technology/fbi-documents-reveal-new-information-baltimore; Ashley Gorski, *New NSA Documents Shine More Light into Black Box of Executive Order 12333* (Oct. 30, 2014), https://www.aclu.org/blog/new-nsa-documents-shine-more-light-black-box-executive-order-12333; ACLU, *Battle for Benefits: VA Discrimination Against Survivors of Military Sexual Trauma* (Nov. 2013), https://www.aclu.org/documents/battle-benefits-va-discrimination-against-survivors-military-sexual-trauma.

[61] *See, e.g.*, ACLU, *Know Your Rights*, https://www.aclu.org/know-your-rights (last updated Feb. 20, 2026); ACLU Women's Rights Project, *Domestic Violence and Homelessness*, https://www.aclu.org/sites/default/files/pdfs/dvhomelessness032106.pdf.

[62] *See* https://www.aclu.org/blog.

serves as a clearinghouse for news about ACLU cases, including analysis about case developments and an archive of case-related documents. Through these pages, and with respect to each specific civil liberties issue, the ACLU provides the public with educational material, recent news, analyses of relevant congressional or executive branch action, government documents obtained through FOIA requests, and further in-depth analytic and educational multi-media features.[63] The ACLU website includes many features on information obtained through the FOIA. The ACLU maintains an online "Torture Database," a compilation of over 100,000 pages of FOIA documents that allows researchers and the public to conduct sophisticated searches of its contents relating to government policies on rendition, detention, and interrogation.[64] The ACLU has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through the FOIA. [65]

ii. NWLC is primarily engaged in disseminating information to inform the public about actual or alleged government activity.

NWLC is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II). Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of NWLC's work and are among its primary activities. *See, e.g.*, *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. DOD,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003).

---

[63] *See, e.g., ACLU v. ODNI*—FOIA Lawsuit Seeking Records About Government Surveillance Under the USA Freedom Act, ACLU Case Page, https://www.aclu.org/cases/aclu-v-odni-foia-lawsuit-seeking-records-about-government-surveillance-under-usa-freedom-act; *ACLU v. DOJ*—FOIA Lawsuit Seeking Information on Federal Agencies' Surveillance of Social Media, ACLU Case Page, https://www.aclu.org/cases/aclu-v-doj-foia-lawsuit-seeking-information-federal-agencies-surveillance-social-media; *ACLU v. DOJ*—FOIA Case for Records Relating to Targeted Killing Law, Policy, and Casualties, ACLU Case Page, https://www.aclu.org/cases/aclu-v-doj-foia-case-records-relating-targeted-killing-law-policy-and-casualties; Executive Order 12,333—FOIA Lawsuit, ACLU Case Page, https://www.aclu.org/cases/executive-order-12333-foia-lawsuit; ACLU Motions Requesting Public Access to FISA Court Rulings on Government Surveillance, ACLU Case Page, https://www.aclu.org/cases/aclu-motions-requesting-public-access-fisa-court-rulings-government-surveillance; *ACLU v. DOJ*—FOIA Lawsuit Demanding OLC Opinion "Common Commercial Service Agreements, ACLU Case Page, https://www.aclu.org/cases/aclu-v-doj-foia-lawsuit-demanding-olc-opinion-common-commercial-service-agreements; FOIA Request for Justice Department Policy Memos on GPS Location Tracking, ACLU Case Page, https://www.aclu.org/cases/foia-request-justice-department-policy-memos-gps-location-tracking; Florida Stingray FOIA, ACLU Case Page, https://www.aclu.org/cases/florida-stingray-foia; Nathan Freed Wessler, *ACLU-Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida,* (Feb. 22, 2015) https://www.aclu.org/blog/free-future/aclu-obtained-documents-reveal-breadth-secretive-stingray-use-florida?redirect=blog/national-security-technology-and-liberty/aclu-obtained-documents-reveal-breadth-secretive-sting.

[64] *The Torture Database*, ACLU Database, https://www.thetorturedatabase.org; *see also Countering Violent Extremism FOIA Database*, ACLU Database, https://www.aclu.org/foia-collection/cve-foia-documents; *TSA Behavior Detection FOIA Database*, ACLU Database, https://www.aclu.org/foia-collection/tsa-behavior-detection-foia-database; *Targeted Killing FOIA Database*, ACLU Database, https://www.aclu.org/foia-collection/targeted-killing-foia-database.

[65] *Index of Bush-Era OLC Memoranda Relating to Interrogation, Detention, Rendition and/or Surveillance*, ACLU (Mar. 5, 2009), https://www.aclu.org/sites/default/files/pdfs/ safefree/ olcmemos_2009_0305.pdf; *Statistics on NSL's Produced by Department of Defense*, ACLU, https://assets.aclu.org/live/uploads/document/nsl_stats.pdf.

NWLC has a supporter base of over 663,856 followers across our social media channels, including Instagram (over 76,000 followers) and Bluesky (over 31,000 followers), as well as over 778,000 subscribers to our email list. In February 2026, the NWLC's website, www.nwlc.org, had 168,000 page views, of which 102,000 were unique visitors. NWLC regularly issues press releases and statements regarding government activity and related impacts on gender justice and issues that impact women, LGBTQIA+ people, children, and families. In addition, NWLC regularly publishes reports about government conduct and gender justice issues based on its analysis of information and materials from various sources, including government documents and data sets. Accordingly, NWLC is primarily engaged in disseminating information.

iii. The NCLEJ is primarily engaged in disseminating information to inform the public about actual or alleged government activity.

NCLEJ is "primarily engaged in disseminating information" within the meaning of the statute and its implementing regulations. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of NCLEJ's work and are among its primary activities. *See, e.g.*, *Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr.,* 241 F. Supp. 2d at 11.

NCLEJ's mission is to advance the cause of economic justice for low-income individuals, families, and communities across the country. NCLEJ's work and primary activities include obtaining records and information about federal government activity, reviewing and analyzing such records and information, and publishing and sharing such records and information to the press and public. NCLEJ regularly publishes blog posts and statements on its website to provide information, analysis, and commentary regarding civil rights issues affecting low-income people, individuals with disabilities, and communities of color. NCLEJ also issues press releases to call attention to documents obtained through FOIA requests as well as other breaking news. NCLEJ attorneys are frequently interviewed for news stories regarding recent government actions and civil rights issues.

iv. The ACLU-IL is primarily engaged in disseminating information to inform the public about actual or alleged government activity.

The ACLU-IL is "primarily engaged in disseminating information" within the meaning of the statute and its implementing regulations. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public is a critical and substantial component of the ACLU-IL's work and one of its primary activities. *See, e.g.*, *Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr.,* 241 F. Supp. 2d at 11.

The ACLU-IL has the ability and intention to widely disseminate the requested

information through a variety of sources, including reports, newsletters, news briefings, right-to-know handbooks, and other materials, to the public at no cost. For example, the ACLU-IL publishes, analyzes, and disseminates information and materials through its website, www.aclu-il.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU-IL is focused. The ACLU-IL's website also includes many features on information related to and obtained through FOIA requests and litigation, including recent litigation by the ACLU-IL and other ACLU state affiliates against the U.S. Department of Homeland Security and U.S. Customs and Border Protection over its failure to produce government documents about the on-the-ground implementation of President Trump's Muslim bans.[66]

v. <u>The ACLU-CO is primarily engaged in disseminating information to inform the public about actual or alleged government activity.</u>

The ACLU-CO is "primarily engaged in disseminating information" within the meaning of the statute and its implementing regulations. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Indeed, obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public is a critical and substantial component of the ACLU-CO's work and one of its primary activities. *See, e.g.*, *Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr.,* 241 F. Supp. 2d at 11.

The ACLU-CO has the ability and intention to widely disseminate the requested information through a variety of sources, including reports, newsletters, news briefings, right-to-know handbooks, and other materials, to the public at no cost. For example, the ACLU-CO publishes, analyzes, and disseminates information through its website, www.aclu-co.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU-CO is focused. The ACLU-CO's website also includes many features on information obtained through FOIA requests and litigation, including recent litigation by the ACLU-CO and the ACLU against U.S. Immigration and Customs Enforcement over its failure to release records regarding the agency's plans to expand immigration detention across Colorado and Wyoming.[67] The ACLU-CO has provided access to the underlying FOIA request, press releases, litigation documents, as well as the 115 pages of records ultimately obtained from the agency.[68]

---

[66] *See, e.g.*, Press Release, ACLU of Illinois, *ACLU of Illinois Files Lawsuit Demanding Documents on Implementation of Trump Muslim Ban* (Apr. 12, 2017), https://www.aclu-il.org/press-releases/aclu-illinois-files-lawsuit-demanding-documents-implementation-trump-muslim-ban/.

[67] *American Civil Liberties Union Foundation v. U.S. Immigration and Customs Enforcement*, No. 1:25-cv-03271 (S.D.N.Y. Apr. 21, 2025).

[68] ACLU of Colorado, *ACLU et al. v. ICE*, https://www.aclu-co.org/en/cases/aclu-et-al-v-us-ice; ACLU, *ACLU Foundation v. U.S. Immigration and Customs Enforcement*, https://www.aclu.org/cases/american-civil-liberties-

The ACLU-CO also regularly issues press releases to call attention to documents obtained through open records requests, as well as other breaking news,[69] and its attorneys are interviewed frequently for news stories about documents released through ACLU-CO record requests.[70] The ACLU-CO annually publishes two newsletters that reach more than 40,000 Coloradans, as well as updates reaching its approximately 19,700 followers on Instagram and 23,500 people who follow its Facebook page.

Together, the Requesting Parties plan to analyze, publish, and disseminate to the public the information and materials gathered through this Request. The records requested are not sought for commercial use, and the Requesting Parties plan to disseminate the information disclosed as a result of this Request to the public at no cost.

**b. The Records Sought Are Urgently Needed to Inform the Public About Actual or Alleged Government Activity.**

These records are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, they pertain to whether HHS and its subcomponents violated and continue to violate federal laws, regulations, and/or policies by imposing unprecedented restrictions on access to essential child care and family assistance funding through the adoption, implementation, and enforcement of the nationwide Enhanced Defend the Spend Policy and the Five-State Funding Freeze. As discussed in Part I, *supra*, these restrictions have already been the subject of widespread public controversy and media attention, particularly because the purported justifications for these restrictions stem from a YouTube creator's unsubstantiated fraud allegations targeted against Somali-owned child care providers and because these restrictions are being improperly deployed against Democratic elected officials for partisan political gain.[71]

union-foundation-v-u-s-immigration-and-customs-enforcement; ACLU, Colorado ICE Detention, https://www.aclu.org/documents/colorado-ice-detention.

[69] *See, e.g.*, Press Release, ACLU of Colorado, ACLU FOIA Litigation Reveals New Information about Plans to Expand ICE Detention in Colorado, (July 9, 2025), https://www.aclu-co.org/press-releases/page/; Press Release, ACLU of Colorado, ACLU, ACLU of Colorado Sue ICE for Records Regarding Potential Expansion of Immigration Detention in Western States (Apr. 21, 2025), https://www.aclu-co.org/en/press-releases/aclu-aclu-colorado-sue-ice-records-regarding-potential-expansion-immigration; Press Release, ACLU of Colorado, ACLU Seeks Info into Denver Police Use of Social Media Surveillance (Oct. 6, 2016), https://www.aclu-co.org/news/aclu-seeks-info-denver-police-use-social-media-surveillance/; Press Release, ACLU of Colorado, ACLU Files Suit for Records Illegally Denied by Immigration and Customs Enforcement (ICE) (Aug. 24, 2016), https://www.aclu-co.org/news/aclu-files-suit-records-illegally-denied-immigration-and-customs-enforcement-ice/.

[70] *See, e.g.*, Chris Walker, Denver Police Use Social Media to Follow Activists, Bring Back Fears of Spy Files, Westword (January 17, 2017), https://www.westword.com/news/denver-police-use-social-media-to-follow-activists-bring-back-fears-of-spy-files-8696953 (quoting ACLU of Colorado Legal Director).

[71] *See supra*, Part I.

As discussed further, *supra*, the programs targeted by the Enhanced Defend the Spend Policy and Five-State Funding Freeze, including CCDF, TANF, and SSBG, provide essential child care and family assistance that enable parents and caregivers with low incomes to work, go to school, attend medical appointments, and otherwise secure basic needs for themselves and their families. Disruptions in these programs and services inflict significant immediate and long-term harms on these families and their children, with disproportionate impacts on women with low incomes—and, in particular, Black women and other women of color. Accordingly, the records sought relate to a matter of widespread and exceptional public and media interest in the administration's efforts to restrict access to essential child care and family assistance funding.

Further underscoring the urgency of informing the public about the restrictions at issue in this Request is the strong media interest in what little has been revealed publicly about that conduct. Numerous media reports have emphasized the lack of clarity and transparency related to the Enhanced Defend the Spend Policy and the Five-State Funding Freeze, including what data and documentation will be required from states, territories, and tribes to draw down their already-obligated child care and family assistance funds.[72] Many of these reports detail the harms just from the uncertainty caused by these actions, particularly for child care providers who already operate on extremely slim profit margins and the families and children who rely on those providers for essential care and services.[73] Given this media interest and the lack of public information about the adoption, implementation, and enforcement of the Enhanced Defend the Spend Policy and the Five-State Funding Freeze at issue in this Request, there is an urgent need to inform the public about these restrictions and related impacts on child care and family assistance programs. Expedited processing is therefore appropriate under 5 U.S.C. § 552(a)(6)(E) and the Agency's implementing regulations.

## IV. **Application for Waiver or Limitation of Fees**

We request a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). We also request a waiver of search fees on the grounds that the Requesting Parties qualify as "representative[s] of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

---

[72] *See, e.g.*, Bryce Covert, *Trump's Effort to Restrict Child Care Funding Puts Programs and Families at Risk*, The 74 Million (Jan. 12, 2026), https://www.the74million.org/zero2eight/trumps-changes-to-child-care-funding-could-spell-disaster-for-providers/; Andrea Hsu, *Illinois child care providers on edge amid ongoing uncertainty around federal funding*, NPR (Feb. 16, 2026), https://www.npr.org/2026/02/16/nx-s1-5711241/illinois-child-care-providers-on-edge-amid-ongoing-uncertainty-around-federal-funding.

[73] *See, e.g.*, Steph Quinn & Annelise Hanshaw, *Feds demand Missouri justify child care expenses to receive delayed funding*, The Missouri Independent (Jan. 13, 2026), https://www.newstribune.com/news/2026/jan/13/feds-demand-missouri-justify-child-care-expenses/.

**a. The Request Is in the Public Interest Because It Will Likely Contribute Significantly to Public Understanding of the Operations or Activities of the Government and Is Not Primarily in the Commercial Interest of the Requesting Parties.**

As discussed in great detail in Parts I and III, this Request concerns serious and urgent questions surrounding the administration's recent restrictions and related impacts on federal child care and family assistance funds to states, territories, and tribes through the Enhanced Defend the Spend Policy and the Five-State Funding Freeze, as well as the extraordinary access to sensitive information and materials by individuals associated with the HHS DOGE Team and/or USDS. Little information is publicly available regarding the Enhanced Defend the Spend Policy and the Five-State Funding Freeze at issue in this Request, so the records sought are certain to contribute significantly to the public's understanding of these policies and their impacts.[74]

The Requesting Parties are not filing this Request to further any commercial interest. As described above, any information and records disclosed as a result of this Request will be made available by the requesting parties to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted)).

**b. The Requesting Parties Are Representatives of the News Media and the Records Are Not Sought for Commercial Use.**

We also request a waiver of search fees on the grounds that each of the Requesting Parties qualify as "representative[s] of the news media," and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). All organizations meet the statutory and regulatory definitions of a "representative of the news media" because each organization is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III); *see also Nat'l Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network v. Dep't of Defense*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. Dep't of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in

---

[74] *See supra*, Parts I, III.

disseminating information”). The Requesting Parties therefore are “representative[s] of the news media” for the same reasons they are “primarily engaged in the dissemination of information.”[75]

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to those of the Requesting Parties to be “representatives of the news media” as well. *See, e.g.*, *Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a “representative of the news media” for purposes of the FOIA); *Nat’l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep’t of Justice*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a “public interest law firm,” a news media requester).[76]

* * *

On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU, ACLU-CO, ACLU-IL, NWLC, and NCLEJ.[77] As was true in those instances, the Requesting Parties meet the requirements for a fee waiver here.

* * *

Pursuant to applicable statutes and regulations, we expect a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii).

---

[75] *See supra*, Part III.

[76] Courts have found these organizations to be “representatives of the news media” even though they engage in litigation and lobbying activities beyond their dissemination of information and public education activities. *See, e.g.*, *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat’l Sec. Archive*, 880 F.2d at 1387; *see also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53–54.

[77] For example, in July 2025, the U.S. Equal Employment Opportunity Commission granted NWLC a fee-waiver request regarding a FOIA request for documents relating to the Commission’s enforcement actions and policies. As to the ACLU, in June 2018, the U.S. Citizenship and Immigration Services granted a fee-waiver request regarding a FOIA request for documents relating to the use of social media surveillance. In August 2017, CBP granted a fee-waiver request regarding a FOIA request for records relating to a muster sent by CBP in April 2017. In June 2017, the Department of Defense granted a fee-waiver request regarding a FOIA request for records pertaining to the authorities approved by President Trump in March 2017 which allowed U.S. involvement in Somalia. In June 2017, the Department of Defense, the CIA, and the Office of Inspector General granted fee-wavier requests regarding a FOIA request for records pertaining to U.S. involvement in the torture of detainees in prisons in Yemen, Eritrea, and aboard Yemeni or Emirati naval vessels. In May 2017, CBP granted a fee-waiver request regarding a FOIA request for documents related to electronic device searches at the border. In April 2017, the CIA and the Department of State granted fee-waiver requests in relation to a FOIA request for records related to the legal authority for the use of military force in Syria. In March 2017, the Department of Defense Office of Inspector General, the CIA, and the Department of State granted fee-waiver requests regarding a FOIA request for documents related to the January 29, 2017 raid in al Ghayil, Yemen. In June 2016, the Office of the Director of National Intelligence granted a fee-waiver request regarding a FOIA request related to policies and communications with social media companies’ removal of “extremist” content. In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the Department of Justice for documents related to Countering Violent Extremism Programs.

If the Request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. We expect the release of all segregable portions of otherwise exempt material. We further reserve the right to appeal a decision to withhold any information or deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish the records to:

Linda S. Morris
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, New York 10004
T: 212.549.2500
LindaM1@aclu.org

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

Respectfully submitted,

*/s/ Linda S. Morris*

Linda S. Morris
Ming-Qi Chu
Jennesa Calvo-Friedman
Viviana Bonilla López
Aditi Fruitwala
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
LindaM1@aclu.org

Allison Siebeneck
Melissa L. Staas
The Roger Baldwin Foundation of
ACLU, Inc.
150 N. Michigan Ave, Suite 600
Chicago, IL 60601
T: 312.201.9740

Amy Matsui
Whitney Pesek
Alison Tanner
Sonia Marton
National Women's Law Center
1350 Eye Street NW, Suite 700
Washington, D.C. 20005
T: 202.588.5180

Saima Akhtar
National Center for Law and
Economic Justice
50 Broadway, Suite 500
New York, NY 10004
T: 212.633-6967

Sara R. Neel
ACLU Foundation of Colorado
303 E. 17th Ave., Suite 350
Denver, CO 80203
T: 303.777.5482